***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon review of the evidence modifies and affirms the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over the parties and this claim. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The employer-employee relationship existed between defendant-employer and plaintiff at all relevant times.
3. RSKCo was the workers' compensation carrier on risk for defendant-employer at all relevant times.
4. Plaintiff's average weekly wage was $358.69 per week at all relevant times.
 ***********
Based on the foregoing stipulations and the evidence the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff has been employed with Revlon or its predecessors in cosmetic manufacturing for 20 years. Plaintiff is right-hand dominant.
2. Plaintiff's jobs included picker-packer/order filler, assembler/packager and manifest job. The picker-packer job depicted in the videotape submitted by the parties includes folding cardboard boxes, use of a hand scanner, retrieval of products from bins and boxing the products for orders. The assembler/packaging job involves putting caps on containers, assembling compacts and packaging products. The job demands of this position vary by product line and weight. The assembler position shown in the videotape does not include the mascara and lipstick lines. All of these jobs require repetitive gripping and flexion of the hands, wrist, and fingers.
3. On 6 November 1992, plaintiff presented to her family physician, Dr. David Day. Plaintiff complained that for approximately one month she had experienced pain in her right thumb and numbness that radiated from the thumb to the elbow on the extensor surface of the right arm, pain in the volar surface of the right wrist and aching discomfort in the second and third fingers of the right hand. At that time, plaintiff was working as a picker-packer folding cardboard boxes and she described the duties to Dr. Day. Dr. Day diagnosed plaintiff with right carpal tunnel syndrome and tendonitis of the right thumb due to the repetitive nature of her job. He recommended that plaintiff use a splint at night and prescribed anti-inflammatory medication. Dr. Day contacted defendant-employer's plant nurse to suggest a modification of plaintiff's job tasks. Plaintiff was switched to a different job and her right hand pain and numbness improved. Plaintiff missed no time from work as a result of her right hand symptoms.
4. On 5 February 1995, plaintiff returned to Dr. Day with complaints of left trigger thumb. Dr. Day described the condition as a type of tendonitis that occurs when the flexor tendon of a thumb is overused and a degeneration of the collagen in the tendon causes swelling in the tendon. The result is that the thumb cannot be smoothly extended and the use of the thumb causes a great deal of pain. Dr. Day related the condition to plaintiff's job duties. Plaintiff requested workers' compensation coverage and the plant nurse, Regina Ford, filed a Form 19 Employer's Report of Employee's Injury or Occupational Disease to the Industrial Commission. By letter dated 26 June 1995, defendant-employer notified plaintiff that her claim was being denied as non-work related. The 26 June 1995 denial letter stated:
 This letter is regarding the above workers' compensation claim which was submitted for consideration. After completing our investigation of this claim we have determined that the problems you are experiencing are unrelated to the job that you perform. We are therefore advising you that we cannot consider this claim and are denying this claim pending any further claim within the statutory period.
5. Plaintiff missed two weeks of work and after receiving treatment for the left trigger thumb she returned to work. Because of the denial letter, plaintiff did not file a Form 18 Notice of Accident to Employer or otherwise pursue her claim further.
6. On 7 February 1997, plaintiff returned to Dr. Day for tingling of the right hand and fingers and left trigger thumb. Dr. Day gave her an injection for her left thumb and again recommended use of a splint for her right wrist. Plaintiff returned to Dr. Day on 5 December 1997 with complaints of a flare up in her symptoms and an increased tingling and numbness in her left thumb and right index and third fingers. Dr. Day referred her to Dr. Ralph Liebelt, an orthopedic surgeon with Triangle Orthopaedics.
7. Dr. Liebelt performed a right carpal tunnel release and a left trigger thumb release on plaintiff on 20 February 1998. As a result of the surgery, plaintiff was out of work until 18 May 1998. Plaintiff did not make a claim for workers' compensation benefits relating to the 1998 surgery or resulting disability, and defendant-employer did not file a Form 19. Plaintiff was released to return to work without restrictions on 18 May 1998. Her surgery corrected her problem and resolved her disability.
8. Upon her return to work in May 1998, plaintiff was able to work for approximately two years performing the manifest job, which was much less repetitive in comparison to the picker-packer/order filler position. According to Dr. Liebelt, plaintiff had very little trouble performing these duties. On 7 March 2000, plaintiff was reassigned to the job of picker-packer/order filler because the manifest job was phased out. Within a short period of time, plaintiff began to experience increased pain in both of her hands and wrists.
9. On 24 March 2000, Dr. Day's partner, Dr. Ralph P. Willett, diagnosed plaintiff with bilateral carpal tunnel syndrome, with the right wrist being worse than the left. In his note, Dr. Willett opined that plaintiff's condition was casually related to her job duties in the position of picker-packer/order filler.
10. By 28 March 2000, plaintiff was unable to continue performing the picker-packer/order filler job due to the pain primarily in her right hand and wrist. Plaintiff requested a change in job from her plant manager, but was informed that she either had to continue in her current position or take a six-month leave of absence.
11. On 30 March 2000, plaintiff presented to Dr. Day, who confirmed Dr. Willett's diagnosis of bilateral carpal tunnel syndrome, with the right wrist being worse than the left. Plaintiff explained to Dr. Day the choice she had been given by her plant manager and Dr. Day recommended that plaintiff take the six-month leave of absence. Plaintiff was out of work from 29 March 2000 until 4 February 2001.
12. During plaintiff's leave of absence, which began on 29 March 2000, she resumed treatment with Dr. Liebelt of Triangle Orthopaedics. Dr. Liebelt was of the opinion that plaintiff had an aggravation of her right wrist condition, tendonitis, and tenosynovitis suggestive of overuse syndrome. By July 2000, plaintiff had developed causalgia in her right wrist, which was caused by scarring around the medial nerve. Dr. Liebelt opined that the scarring, in part, could have caused the recurrent tenosynovitis and tendonitis. He recommended another right carpal tunnel and left trigger thumb release. Dr. Liebelt performed the surgery on 13 November 2000, and wrote plaintiff out of work for six weeks following the surgery. Plaintiff did not have surgery on her left wrist. Plaintiff remained out of work with work excuses from Triangle Orthopaedics until 4 February 2001 due to her second right carpal tunnel and left trigger thumb surgery. There is no evidence that plaintiff's incapacity to work from 29 March 2000 to 4 February 2001 was caused by left carpal tunnel syndrome symptoms.
13. Dr. Liebelt opined that plaintiff's job duties, which he viewed via videotape and also observed during a visit to defendant-employer's plant, significantly contributed to the development of plaintiff's carpal tunnel syndrome and placed her at an increased risk of contracting carpal tunnel syndrome over the general public not so employed. Dr. Liebelt also opined that plaintiff should permanently refrain from the job duties of picker-packer/order filler and assembler/packaging.
14. On or about 28 March 2000, defendant-employer's plant nurse filed a Form 19 report on plaintiff's injury. On 23 May 2000, defendants filed a Form 61 Denial of Workers' Compensation Claim, contending that plaintiff "does not suffer from an occupational disease" and plaintiff "has not been disabled to the extent claimed." Plaintiff filed a Form 18 on 16 June 2000, alleging bilateral carpal tunnel syndrome incurred on 8 March 2000, and that her disability began on 29 March 2000. On 18 December 2001, plaintiff filed a Form 33 Request for Hearing. On 24 January 2002, defendants filed a Form 33R Response to Request for Hearing in which they again claimed that plaintiff had not suffered a compensable injury by accident or occupational disease. Defendants stated that plaintiff's symptoms were related to a "non work-related medical condition."
15. On 28 February 2001, plaintiff underwent a functional capacity evaluation performed by the occupational hand therapist, Ms. Walsh. According to test results, plaintiff should not perform production and repetitive-type work.
16. After her return to work on 5 February 2001, plaintiff's job assignments varied, but included packaging and assembling cosmetic parts. She continued to have problems with pain in both hands, but used sick leave, vacation days, medical leave and voluntary time off to rest her hands. Dr. Liebelt again took plaintiff out of work from 6 March 2001 to 13 March 2001.
17. Plaintiff's job duties as a picker-packer/order filler in 2000 materially aggravated her pre-existing, non-disabling right hand condition and exposed her to an increased risk over the general public of aggravating her right hand and left trigger thumb condition. But for plaintiff's reassignment to the job of picker-packer/order filler rather than a less repetitive job, it is likely that plaintiff's right carpal tunnel syndrome and left trigger thumb pain would not have developed again to such an extent that it became disabling. Plaintiff had been able to work for almost two years in a less demanding, less repetitive job after her right carpal tunnel and left trigger thumb surgery in May 1998. Although the repetitive flexion and gripping with her hands, fingers, and wrists did cause some pain, plaintiff was able to work full-time from 18 May 1998 until 29 March 2000. She was reassigned to the duties of picker-packer/order filler in 2000 and within weeks her right carpal tunnel and left trigger thumb condition recurred and became disabling.
18. According to Dr. Liebelt, it would be in plaintiff's best medical interest to cease performing repetitive-type work with defendant-employer and to permanently refrain from such activities.
19. Subsequent to the hearing before the Deputy Commissioner, plaintiff underwent a left carpal tunnel release on 30 August 2002. Plaintiff remained out of work during the recuperation from that surgery. Plaintiff's disability resulting from left carpal tunnel syndrome beginning 30 August 2002 was her first period of disability for left carpal tunnel syndrome.
20. Plaintiff's claim for compensation for right carpal tunnel syndrome is not time-barred as it resulted from the aggravation of a pre-existing, non-disabling condition. Dr. Liebelt opined and the Full Commission finds that patients who have had prior surgery for carpal tunnel syndrome are not more likely to experience a relapse of carpal tunnel syndrome. These patients, however, are more likely to experience a relapse of their tenosynovitis and tendonitis (the underlying etiology of the carpal tunnel syndrome) if the patient returns to the same type of repetitive activities that contributed to the development of the tendonitis and tenosynovitis initially. In plaintiff's case, she was able to return to work without restrictions and work for approximately two years after her 1998 right carpal tunnel release surgery until she was placed back in the picker-packer/order filler job which initially caused her right carpal tunnel syndrome condition. Upon resumption in 2000 of the same repetitive, production driven job duties that initially caused her right carpal tunnel syndrome and left trigger thumb, plaintiff predictably experienced a recurrence of tendonitis and tenosynovitis in her right hand, which caused a new period of disability separate and apart from her prior condition more than two years earlier, which had resolved. Plaintiff's disability in March 2000 constituted a new injury by accident, not a continuation of her prior condition. In addition, plaintiff's mildly symptomatic non-disabling carpal tunnel syndrome in her left hand became very painful and led to surgery on 30 August 2002 and an additional period of disability thereafter.
21. Dr. Liebelt rated plaintiff with a 10% permanent partial disability of her right hand and a 5% permanent partial disability of the left hand. Dr. Liebelt opined that should plaintiff later have carpal tunnel release surgery to the left hand, the rating would not change.
22. Based upon plaintiff's severe bilateral hand condition and the uncontradicted testimony of her physicians, the Full Commission finds as a fact that plaintiff is permanently disabled from employment with Revlon and, without retraining or education, will be permanently disabled from employment where she is able to earn the same or greater wages.
23. Plaintiff would benefit from vocational rehabilitation to retrain her for non-repetitive work involving her hands.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. In March 2000, as a result of the overuse of her hands while performing the highly repetitive, production-driven job as a picker-packer/order filler, plaintiff developed a recurrence of tendonitis and tenosynovitis in her right hand and increased left trigger thumb problems, which had previously resolved. These symptoms appeared several weeks after plaintiff was reassigned to job duties that had previously caused her disabling right carpal tunnel syndrome and left trigger thumb pain. N.C. Gen. Stat. § 97-53(13).
2. Plaintiff's job duties as a picker-packer/order filler in March 2000 significantly contributed to the development of and subsequent material aggravation of her right hand tendonitis and tenosynovitis, which caused right carpal tunnel syndrome and left trigger thumb pain, and exposed her to an increased risk over the general public not so employed of materially aggravating these conditions. N.C. Gen. Stat. § 97-53(13); SeeWalston v. Burlington Industries, 304 N.C. 670, 305 N.C. 296,285 S.E.2d 822 (1982).
3. But for the reassignment of plaintiff to the job of picker-packer/order filler in March 2000 rather than a less repetitive job, plaintiff's right hand and wrist condition and left trigger thumb pain would not have developed to such an extent that it became disabling. Plaintiff had worked almost two years in a less demanding, less repetitive job. Although the flexion and gripping motions of her hands, wrists and fingers in the less repetitive manifest job did cause some pain, plaintiff was able to work full-time.
4. Plaintiff's job duties significantly contributed to the development of her left carpal tunnel syndrome, which became disabling on 30 August 2002, and placed her at an increased risk of developing or aggravating her left carpal tunnel syndrome over the general public not so employed. N.C. Gen. Stat. § 97-53(13); See Walston v. Burlington Industries,304 N.C. 670, 305 N.C. 296, 285 S.E.2d 822 (1982). Plaintiff's disability for her left carpal tunnel syndrome began on 30 August 2002.
5. Plaintiff's claim for compensation for her disability from 29 March 2000 until 4 February 2001 and from 6 March 2001 to 13 March 2001 due to her right hand tendonitis and tenosynovitis and left trigger thumb is not time barred by the two-year jurisdictional limit in section 97-58, as it was a new occupational disease claim based upon aggravation of a pre — existing, non-disabling condition. See N.C. Gen. Stat. § 97-58 (2003).
6. Plaintiff's average weekly wage at the relevant time was $358.69, yielding a compensation rate of $239.14 per week. Plaintiff's is entitled to receive total disability benefits in the weekly amount of $239.14 from 29 March 2000 to 4 February 2001, from 6 March 2001 through 13 March 2001, and from 30 August 2002 and continuing until plaintiff returns to work or until further Order of the Commission.
7. Plaintiff is not seeking compensation for disability due to her 1995 and 1998 hand conditions. No workers' compensation claims have been filed and no determinations of compensability have been made.
8. Plaintiff is entitled to the payment of medical expenses incurred for the treatment of her occupational injuries beginning 24 March 2000 and continuing so long as such treatments are reasonably required to effect a cure, give relief and/or lessen plaintiff's period of disability. N.C. Gen. Stat. § 97-25.
9. Plaintiff is in need of and would benefit from vocational training to prepare her for new employment at the expense of defendants.Industrial Commission Rules for Rehabilitation Professionals III (F)(6).
10. Defendants had reasonable grounds to defend this claim.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to counsel fees hereinafter approved, defendants shall pay plaintiff temporary total disability benefits in the weekly amount of $239.14 from 29 March 2000 to 4 February 2001, from 6 March 2001 to 13 March 2001, and from 30 August 2002 and continuing until plaintiff returns to work or until further Order of the Commission. Those amounts, which have accrued, shall be paid in a lump sum.
2. Defendants shall pay for all medical expenses incurred or to be incurred by plaintiff as a result of her compensable injury when bills for same have been submitted and approved according to procedures adopted by the Industrial Commission, beginning in March 2000 and continuing for so long as such evaluations, treatments and examinations may reasonably be required to effect a cure, give relief and/or lessen plaintiff's period of disability.
3. A reasonable attorney fee in the amount of 25% of the compensation approved and awarded for plaintiff is approved and allowed for plaintiff's counsel. The attorney fee shall be deducted from the accrued compensation due plaintiff and paid directly to plaintiff's attorney. Thereafter, every fourth check shall be paid directly to plaintiff's counsel.
4. Plaintiff shall be reimbursed for all of her out-of-pocket medical expenditures.
5. Defendants are entitled to a credit for benefits paid to plaintiff from any employer-funded disability plan after 29 March 2000. This credit shall be deducted on a week for week basis with no carry-forward or carry-back.
6. Defendants shall pay the costs of this action.
This the ___ day of March 2004.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ LAURA K. MAVRETIC COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER